UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RONALD R. and SUSAN M. WARNECKE,<br><br>                    Plaintiffs,<br><br>        v.<br><br>NITROCISION, LLC, an Idaho limited liability company; WILLIAM RIGBY, an individual; DIANE KIEHN, an individual; TRUTECH, L.L.C., a Nevada limited liability company; NITROCISION HANFORD, LLC, an Idaho limited liability company,<br><br>                    Defendants. | Case No. 4:10-cv-00334-CWD<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**Dkt. 46<br>Dkt. 61<br>Dkt. 66<br>Dkt. 68<br>Dkt. 70<br>Dkt. 96** |

**INTRODUCTION**

This case arises from an employment dispute between Ronald Warnecke and his

former business associate, William Rigby. Warnecke and his wife brought this action

against Rigby, Ribgy's daughter Diane Kiehn, and three companies that Warnecke

founded and worked at with Rigby – Nitrocision, LLC ("Nitrocision"), TruTech, L.L.C.

("TruTech"), and Nitrocision Hanford LLC.[1] Plaintiffs generally allege that Warnecke

---

[1] Rigby, Nitrocision, TruTech, and Nitrocision Hanford LLC are represented by
the same counsel and will be referred to collectively as "Defendants." Defendant Kiehn

**MEMORANDUM DECISION AND ORDER - 1**

was wrongfully forced out of his position with Nitrocision by Rigby at the behest of

Kiehn, and that Warnecke is owed payment for personal loans made to the company,

reimbursement for expenses incurred on behalf of the company under his employment

contract, and payment for vacation time accrued during his time with Nitrocision.

Plaintiffs also allege that Defendants wrongfully terminated their health insurance

benefits three months after Warnecke's employment ended in violation of the

Consolidated Omnibus Budget Reconciliation Act.

There are six motions before the Court: (1) Plaintiffs' Motion for Partial Summary

Judgment (Dkt. 46); (2) Plaintiffs' Motion to Strike, (Dkt. 61), which asks the Court to

strike the affidavit of David Smith, Defendants' forensic accountant; (3) Defendants'

Motion in Limine, (Dkt. 66), seeking exclusion of testimony concerning the valuation of

any business entity at issue in this litigation; (4) Plaintiffs' Motion in Limine, (Dkt. 68),

seeking exclusion of testimony or evidence concerning Warnecke's income after his

termination from Nitrocision and seeking the exclusion of Defendants' Counterclaims; (5)

Defendant Kiehn's Motion to Amend Answer and Remove Joinder in Counterclaim and

Motion in Limine (Dkt. 70); and (6) Defendant Kiehn's Motion in limine Re: Tortious

Interference and Value of Plaintiff's Interest in Nitrocision at the Time of Dissociation.

(Dkt. 96.)

---

recently obtained separate counsel, has filed an Amended Answer to Plaintiffs'
Complaint, and has not joined in the motions presently before the Court filed by the other
defendants. Where applicable, the Court will distinguish Kiehn from the other defendants.

**MEMORANDUM DECISION AND ORDER - 2**

The parties presented oral argument on the motions on November 1, 2012. During the hearing, the Court ruled from the bench on two of the motions – denying Defendants' Motion in Limine, (Dkt. 66), and granting Defendant Kiehn's motion for leave to file an amended answer. (Dkt. 70.) The remaining motions were taken under advisement and the Court ordered supplemental briefing on certain issues. The supplemental briefing has been received and reviewed and the Court is prepared to rule on the remaining pending motions.

## BACKGROUND

In 1998, Warnecke started a business called TruTech, a consulting firm specializing in hazardous waste clean-up operations. According to Warnecke, TruTech grew quickly, but could not obtain traditional financing because it was a new business. To meet growing expenses, Warnecke received financing from The Idaho Company, a company owned by Defendant Rigby, which provided loans to startup companies such as TruTech. Within six months, TruTech was able to discontinue its line of credit with The Idaho Company and received a line of credit through the Bank of Idaho (also owned by Rigby) at a lower interest rate.

The above interactions between Warnecke and Rigby led to a business relationship that lasted several years. Warnecke served on the boards of The Idaho Company and Bank of Idaho and Rigby served on the board at Nitrocision and TruTech for many years.

In 2001, Warnecke founded Nitrocision. According to Warnecke, the start-up costs for Nitrocision were obtained from loans made by TruTech. TruTech purchased a license

**MEMORANDUM DECISION AND ORDER - 3**

for technology created at the Idaho National Engineering Laboratory, which culminated in the creation of a technology called NitroJet, a liquid nitrogen-based precision cutting and cleaning technology used for precision cutting, cleaning, removing coatings, and nuclear waste decontamination. With the NitroJet technology, Nitrocision secured contracts with petroleum companies and government entities such as NASA and the military. From December of 2001, when the company was founded, until January of 2009, Warnecke was the managing member and CEO of Nitrocision.

Three years after Nitrocision was founded, Leadwood Capital purchased 50% of the company for $2.5 million. As part of the deal with Leadwood Capital, Warnecke became a full-time employee of Nitrocision and entered into a five year employment contract, which was extended at the conclusion of the five year term.

Rigby became involved with Nitrocision in 2005 in connection with Warnecke's efforts to repurchase Nitrocision from Leadwood Capital. In December of 2005, Warnecke borrowed $2,740,500 from Baxter State Bank ("Baxter") for the purpose of repurchasing Leadwood Capital's interest in Nitrocision. According to Rigby, he personally guaranteed Warnecke's loan from Baxter. Rigby also borrowed $300,000 from Baxter to assist in repurchasing Nitrocision. Ultimately, the funds borrowed by the Warneckes and Rigby were used to purchase Leadwood Capital's interest in Nitrocision for a total of $3,070,317.

Rigby alleges that the Warneckes personally, and Warnecke in his capacity as CEO of Nitrocision, defaulted on the loan to Baxter. Thereafter, the bank made a demand

**MEMORANDUM DECISION AND ORDER - 4**

on Rigby based on his personal guaranty. Rigby states that he purchased the note and all rights to the collateral pledged by the Warneckes to avoid default with Baxter.

It is undisputed that, as Nitrocision grew, the company obtained financing from several sources. The nature and amount of these loans, however, is hotly disputed by the parties. Warnecke alleges that he and his wife personally loaned Nitrocision money and they are owed either $1,059,898 or $1,359,898. In contrast, Rigby alleges that Warnecke secured loans for $250,000 and $700,000 from Regional Development Alliance, Inc., and an open line of credit from Ireland Bank for $1.8 million, which was guaranteed by Warnecke and Rigby. Rigby also alleges that Warnecke borrowed money from Rigby himself and his daughter Kiehn, who loaned funds to Nitrocision from her Individual Retirement Account. The loans from Rigby and Kiehn, according to Rigby, were improperly entered into Nitrocision's records as loans from Warnecke to the company.

Rigby also alleges that Warnecke failed to make timely payments on the loans, both as CEO of Nitrocision and individually, and that nearly all of the loans became the responsibility of Rigby under the terms of his personal guarantees.

In an agreement dated December 31, 2008, Warnecke transferred all but 5% of his ownership interest in Nitrocision to Rigby. According to Warnecke, his understanding of the purpose for the transfer was to allow Rigby the opportunity to carry back losses and obtain a tax refund of approximately $800,000. Warnecke also alleges that he and Rigby had an oral agreement that they would ultimately combine The Idaho Company, TruTech, and Nitrocision and be 50/50 owners in the new entity.

**MEMORANDUM DECISION AND ORDER - 5**

According to Warnecke, by the beginning of 2009, his relationship with Rigby began to deteriorate. He alleges that, during a meeting on January 25, 2009, Kiehn accused Warnecke of jeopardizing her family's assets and threatened to kill Warnecke if any money was lost. At the time, Kiehn was not employed by Nitrocision.

In March of 2009, Warnecke resigned his position with Nitrocision at the request of Rigby. Warnecke's version is that he was forced out of the company.

It is undisputed that Nitrocision provided its employees with certain benefits, including health insurance under a plan jointly purchased by Nitrocision, TruTech, and Channel Blend.[2] When Warnecke's employment ended he was given the option to continue his participation in the plan pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). 29 U.S.C. §§ 1161-1169. Nitrocision provided three months of coverage and the coverage was thereafter terminated.

Under the terms of his employment agreement with Nitrocision, it is undisputed that Warnecke was entitled to reimbursement for work related expenses. At the time his employment ended, Warnecke alleges that he was owed reimbursement for $164,801 in unpaid work related expenditures. He also claims that he accrued over 1,300 hours of Paid Time Off ("PTO"), which was not paid to him as it should have been at the time his employment ended.

---

[2] Channel Blend is not a party to this action.

**MEMORANDUM DECISION AND ORDER - 6**

On June 29, 2010, Warnecke and his wife Susan filed this action against his former companies – Nitrocision, TruTech, and Nitrocision Hanford – along with Rigby and his daughter Kiehn. (Dkt. 1.) In their Complaint, the Warneckes assert the following eight causes of action.

First, the Warneckes allege that Nitrocision violated COBRA by terminating health insurance coverage after three months and that they are entitled to damages in the amount of $6,850.80, which represents the difference between the Warneckes' purchase of comparable health insurance on the open market for the time period that they should have been allowed to continue their participation in Nitrocision's plan under COBRA.

Second, Warnecke alleges that he was entitled to reimbursement for business expenditures under the terms of his employment contract, and Nitrocision's failure to pay these expenditures constitute breach of contract.

Third, Warnecke alleges that PTO constitutes wages under Idaho law and that he is entitled to approximately 1,300 hours of PTO wages and treble damages for the failure to pay the PTO.

Fourth, Plaintiffs allege that they were not paid back the various loans made during Mr. Warnecke's tenure with Nitrocision and that Defendants' failure to repay the loans constitutes a breach of the loan agreements.

Fifth, Warnecke alleges that his force-out from his position in Nitrocision constituted a breach of the fiduciary duties owed by the defendants to Warnecke. He claims that this breach caused him damages in an amount to be proven at trial. He also

**MEMORANDUM DECISION AND ORDER - 7**

claims that the allegedly wrongful acts of the defendants was done with malice and that he is therefore entitled to seek punitive damages.

Sixth, Warnecke alleges that he had arranged contracts with clients prior to his force-out and that the defendants actions constituted tortious interference with these contracts as well as interference with Warnecke's employment contract with Nitrocision.

Seventh, Warnecke claims that he remains a 50% shareholder in TruTech, that the defendants have asserted dominion over that company, and that such action constitutes conversion warranting the imposition of a constructive trust.

Warnecke's final cause of action alleges that he did not receive the fair value of his shareholder interest in Nitrocision and TruTech within a reasonable time from his dissociation and that he is entitled to a distribution under Idaho law.

## DISCUSSION

### 1.    Plaintiffs' Motion for Partial Summary Judgment

The Warneckes move the Court for summary judgment on five of the eight claims raised in their Complaint. (*Pl.s' Mot. For Partial Summ. J.*, Dkt. 46.) They also seek summary judgment on Defendants' counterclaims. Each of the claims on which the Warneckes have moved for summary judgment are addressed below.

####    A.    *Legal Standard*

As a preliminary matter, the Warneckes cite Fed. R. Civ. P. 56(c) as the basis for their motion and quote the language from that provision. However, Rule 56 was amended in 2010, and that particular provision no longer exists although the substance of the rule

**MEMORANDUM DECISION AND ORDER - 8**

remains the same. *See* Fed. R. Civ. P. 56, Advisory Committee Notes, 2010 Amendment ("Rule 56 is revised to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged.").

Under the current version of Rule 56, "[a] party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought [and] [t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The amended rule also provides that, "[i]f the court does not grant all the relief requested by the motion, it may enter an order standing any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

It is well established that the purpose of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The rule, however, is not a "procedural shortcut," but a "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

**MEMORANDUM DECISION AND ORDER - 9**

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). However, in evaluating whether the moving party has met this burden, the court must view the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must not make credibility findings, *id.*, and direct testimony of the non-movant must be believed, however implausible. *Leslie v. Group ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

If the moving party satisfies its initial burden, the burden shifts to the non-moving party to produce specific evidence to demonstrate the existence of a "genuine issue for trial." *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Liberty Lobby, Inc.*, 477 U.S. at 247-48. There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id.* at 248. In determining whether a fact is material, the court is required to determine what facts under the substantive claim are necessary to

**MEMORANDUM DECISION AND ORDER - 10**

sustain the cause of action. *Id*. The burden, however, always remains on the moving party to demonstrate that it is entitled to judgment as a matter of law, which in turn, requires the moving party provide the court with the legal authorities supporting the party's position.

## B.     *Plaintiffs' COBRA Claim*

Under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), employers sponsoring health insurance plans are required to provide employees and their dependents who lose coverage "as a result of a qualifying event" with the option of purchasing the continuation of coverage without regard to insurability. 29 U.S.C. § 1161(a). COBRA mandates that employers provide 18 months of coverage to a former employee upon the separation of the employee from the employer. *Id*. at § 1162(2). Small businesses, however, are exempted from the above provisions, and the statute states that the above provisions "shall not apply to any group health plan for any calendar year if all employers maintaining such plan normally employed fewer than 20 employees on a typical business day during the preceding calendar year." *Id*. at § 1161(b).[3]

---

[3] The Warneckes bring their COBRA claim under § 502 of ERISA, which states that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Ninth Circuit has held that claims under 29 U.S.C. § 1132 are equitable in nature and do not require a jury trial. *See Spinelli v. Gaughan*, 12 F.3d 853, 858 (9th Cir. 1993).

The following facts are undisputed concerning this issue: Warnecke's termination from Nitrocision was a "qualifying event" under COBRA; upon Warnecke's termination, Nitrocision offered, and Warnecke accepted, the option of extended coverage under COBRA; the Warneckes' coverage was terminated after three months and the Warneckes obtained health insurance on the open market. It is also undisputed that, although Nitrocision employed less than twenty employees, Nitrocision obtained its insurance policy along with two other companies – TruTech and Channel Blend – and that, when the three companies are combined, they exceed the twenty employee requirement.

Based on these undisputed facts, the Warneckes' request that the Court grant summary judgment and find, as a matter of law, that Nitrocision was obligated to provide COBRA coverage to Plaintiffs for 18 months and the failure to do so violated COBRA. The Warneckes also request that the Court award them damages on this issue in the amount of $6,850.80, which represents the difference between the Warneckes' purchase of comparable health insurance on the open market at a cost of $738.75 per month, less the cost that they were paying for COBRA coverage, $282.03 per month, for a period of 15 months.[4]

---

[4] In their supplemental briefing on this issue, (Dkt. 109), Defendants argued for the first time that the damages sought by the Warneckes are not available under ERISA's civil enforcement provision. Defendants did not, however, supply the Court with legal authorities in support of their argument. Given the failure to supply the applicable legal authorities, the Court will not address the issue at this time.

**MEMORANDUM DECISION AND ORDER - 12**

In their Response to Plaintiffs' motion for summary judgment, Defendants argue that, although Nitrocision obtained the insurance policy with the two other companies, Nitrocision should not be grouped together with those companies for the purpose of determining whether Nitrocision falls within the small-employer exemption under COBRA. The Warneckes anticipated this argument in their motion for summary judgment, and cited a case from the United States Court of Appeals for the Fifth Circuit for the proposition that, where two or more businesses are under common control, each is considered to be a single employer of all the employees in the group. *Kidder v. H & B Marine Inc.*, 932 F.2d 347 (5th Cir. 1991). Nitrocision has not provided the Court with any case law of its own indicating that the above rule from the Fifth Circuit does not apply in the Ninth Circuit, or an explanation why the above rule would not apply under the facts of this case.

At the hearing on the parties' motions, counsel for Nitrocision conceded that Nitrocision, TruTech, and Channel Blend were under common control. Because the three companies were under common control and, when combined, the companies employed more than twenty people, the Court finds that the small business exemption under COBRA does not apply in this case.

During the hearing on the parties' motions, the Court granted Defendants leave to submit supplemental materials identifying additional factual support for their argument on Plaintiffs' COBRA claim. (Dkt. 106.) The supplemental materials indicate that, on April 24, 2009, Warnecke executed a COBRA Coverage Election form for himself, his wife

**MEMORANDUM DECISION AND ORDER - 13**

and two children. (Dkt. 109-2 at 8.) The form states that, "[i]f elected, COBRA continuation coverage will begin on May 1, 2009 and can last until July 31, 2009." (*Id*.) The election form indicated that the Warneckes were entitled to only three months of continuation coverage under COBRA rather than the 18 months required by the statute.

The Warneckes have submitted the deposition testimony of Shaun Mulberry – an employee of Nitrocision responsible for Human Resource matters. (Dkt. 46-10.) The deposition testimony indicates that Nitrocision's management believed the company was required to provide only three months of continuation coverage under COBRA. (*Id*. at 5.) Mulberry also testified that, at the end of the three month period, a letter was sent to Warnecke indicating "that the COBRA benefit period was over." (*Id*.) It is undisputed that Warnecke submitted premium payments for three months then discontinued those payments and obtained health insurance on the open market.

Defendants argue that, by signing the election form (indicating that the Warneckes were only entitled to three months of coverage), Warnecke agreed to less than the full 18 months of coverage provided for under COBRA. In other words, Defendants contend that Warnecke opted out of the time frame for coverage set forth in the statute and that the election agreement should govern what Warnecke was entitled to in this case. However, Defendants have not cited any cases indicating that an employee may enter into a contract for less than the 18 months of continuation coverage under COBRA and the Court questions the legal validity of such a proposition.

**MEMORANDUM DECISION AND ORDER - 14**

Notwithstanding the above discussion, the Court finds that the Warneckes are not entitled to summary judgment on this issue or a declaration from the Court that Nitrocision was obligated to provide 18 months of continuation coverage. COBRA expressly provides that an employer may terminate coverage if the beneficiary fails to make timely premium payments. 29 U.S.C. § 1162(2) and (3). Here, however, the evidence in the record suggests that Warnecke stopped making payments based upon the representation of Nitrocision that the company was only obligated to offer continuation coverage for three months. Nitrocision may be barred by estoppel from claiming that coverage was properly terminated because the Warneckes failed to make payments after three months. But, the Warneckes have not fleshed out this issue sufficiently for the Court to rule at this time that they were entitled to 18 months of continuation coverage as a matter of law. Nor have they provided legal authority demonstrating that they are entitled to the type of relief they seek.

The Warneckes' motion for summary judgment will be denied on this issue.

**C.**     ***Reimbursement for Business Expenses***

In 2003, Warnecke entered into an employment agreement with Nitrocision. The agreement provided for reimbursement of certain expenses. Specifically, the employment agreement contained the following provision:

> SECTION 4: Expenses. Employee is authorized to incur reasonable expenses for promoting the business of Employer, including expenses for entertainment, travel, conventions, meetings and seminars. Any such expenses will be reimbursed by Employer upon presentation by Employee, from time to

**MEMORANDUM DECISION AND ORDER - 15**

time, of an itemized account of his expenditures, accompanied
by sufficient information regarding the nature of such
expenditures to permit Employer to maintain sufficient
records for federal income tax purposes.

(*Decl. Of Ronald Warnecke*, Ex. C, Dkt. 46-5 at 3.)

In 2006, Nitrocision created an Amended and Restated Operating Agreement,
which also provided for reimbursement of expenses by board members. That agreement
provides that "[e]ach Board Member shall be entitled to be reimbursed by the Company,
as an expense of the Company in performing services as part of the Manager, for the
actual, reasonable, and necessary expenses incurred on behalf of the Company upon
submitting an itemized account of the expense to the Company sufficient to substantiate
the expense for tax purposes." (*Id. Ex. D*, Dkt. 46-6.)

Warnecke alleges that he submitted receipts and expense reports to Nitrocision in
compliance with the above contractual provisions. He further alleges that he is entitled to
reimbursement for $164,801.91, and that Nitrocision's refusal to pay the reimbursement
constitutes a breach of contract.

The Warneckes move for summary judgment on this issue. In support of their
motion, they cite to the deposition of Defendant Rigby, in which Rigby testified that
"[w]e acknowledged we owed him something[,] [but] [w]e were trying to determine how
much it was."

**MEMORANDUM DECISION AND ORDER - 16**

Defendants do not take issue with the Warneckes' citation to Defendant Rigby's deposition. They argue, however, that summary judgment is not appropriate on this issue because there is a genuine dispute as to material facts, i.e., what expenses claimed by Warnecke fall within the contractual provisions, and the amount of legitimate expenses actually owed.

In their opposition to the Warneckes' motion for summary judgment, Defendants cite to the Affidavit of David Smith. Smith is a certified public accountant and was hired by Defendants to conduct a forensic analysis prior to the institution of this lawsuit regarding the expenses allegedly incurred by Warnecke. (Dkt. 53-2.) Smith found duplicate vouchers, and numerous discrepancies in the vouchers submitted by Warnecke. For instance, in a report dated February 24, 2010, Smith stated that, "[a]mong the 2,501 invoices submitted in the Employee Expense Reports we found the following: 334 invoices, or 13.4% of the total, were invoices with a duplicate submitted for reimbursement [and] 27.3% of the total dollar amount were invoices with a duplicate." (Dkt. 53-2 at 24.)

There are several other instances where Defendants dispute the amount of expenses owed to Warnecke, but the above passage from Smith's report is sufficient to show that there is a genuine dispute as to material facts on this issue. Put simply, the damages element of Warnecke's breach of contract claim is in dispute. Based on the above discussion, the Court finds that a contract existed and Nitrocision breached the contract. Thus, the Warneckes' motion for summary judgment on this issue will be

**MEMORANDUM DECISION AND ORDER - 17**

partially granted on the issue of liability. The damages element of Warnecke's claim for unpaid business expenses will be left to the jury.

###   D.   *Paid Time Off*

Paid Time Off ("PTO") constitutes wages under the Idaho Wage Claim Act, which provides that upon termination of employment, the employer shall provide the employee with all wages within ten days. Idaho Code § 45-606(1). Under the Act, an employee can bring an action for compensation for unpaid wages. Idaho Code § 45-601(7). It also appears that treble damages are proper for claims relating to unpaid vacation pay under Idaho law. *Whitlock v. Haney Seed Co.*, 759 P.2d 919, 926 (Idaho Ct. App. 1988).

Warnecke alleges that he accrued 1,323.27 hours of PTO during the course of his employment with Nitrocision and that he has not been paid those wages pursuant to Idaho law. The Warneckes move for summary judgment on this issue, arguing that Warnecke is owed $90,393.42 in unpaid PTO, which, when trebled, amounts to $271,180.26.

Defendants do not dispute that PTO constitutes wages under Idaho law or that Warnecke is entitled to payment for PTO. However, like the previous issue, Defendants dispute the amount of PTO that Warnecke actually accrued during his employment with TruTech and Nitrocision. In support of their position, Defendants note that Warnecke was CEO of both companies during the time of his employment, that he implemented the leave policies, and that he failed to put any system in place to ensure that time cards were accurate. In other words, Defendants challenge Warnecke's credibility on this claim, and point out that Warnecke's claim that he took only 44 hours of vacation during the eleven

**MEMORANDUM DECISION AND ORDER - 18**

years of his employment is not credible. Defendants also cite to Rigby's deposition testimony, in which Rigby testified that Warnecke took a family vacation to Europe for three weeks while he was employed by Nitrocision, which exceeds by itself the amount of PTO that Warnecke claims he actually took.

Rigby's deposition testimony is sufficient to defeat the Warneckes' motion for summary judgment on this issue. *Liberty Lobby, Inc.*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *see also*, *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) ("if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.") Here, Defendants have presented evidence contradicting Warnecke's claim that he is entitled to over thirteen hundred hours of PTO.

The Court will grant summary judgment as to liability on this issue and the jury will be instructed that Warnecke is entitled to compensation for unused PTO. There is, however, a genuine dispute as to material facts on the issue of how much PTO Warnecke accrued during his employment. On this issue Plaintiffs' motion for summary judgment will be denied.

**MEMORANDUM DECISION AND ORDER - 19**

## E.   *Loan Agreements*

The Warneckes allege that they made a number of loans to Nitrocision that were not repaid and that Nitrocision's failure to repay the loans constitutes a breach of the loan agreements. In their memorandum in support of their motion, the Warneckes state that the amount owed under the various loan agreements is either $1,059,898.06 or $1,359,898.06. (Dkt. 46-1 at 9.) They state that a promissory note was drafted each time a loan was made, and the Warneckes have attached exemplars of the promissory notes to Mr. Warnecke's declaration. They also provided bank records as an exhibit. The Warneckes seek summary judgment on this issue.

Defendants argue that the Warneckes have failed to substantiate the amounts or source of funds for the alleged loans. Defendants also argue that the documentation supplied by the Warneckes is "fraught with discrepancies." In support of this argument, Defendants once again cite Smith's forensic analysis. According to Smith's report, "[t]he purpose of the examination was to 'provide an accounting of the funds deposited, indicating whether the funds were for debt or equity[.]" (Dkt. 53-2.) The analysis indicates that the documentation purportedly substantiating the Warneckes' loans to Nitrocision are not accurate. (Dkt. 53-2 at 21.) For instance, evaluating a promissory note for a purported loan of $70,000 from Warnecke to Nitrocision, Smith indicates the following:

> Loan #1 for $70,000 has a notation on the note that states "Do not enter into the system – Track separately". A loan to Nitrocision from Ron Warnecke was not deposited on, or

**MEMORANDUM DECISION AND ORDER - 20**

within a few days of December 27, 2005. A disbursement was made by Nitrocision to Ron Warnecke on December 29, 2005 in the amount of $70,000, but the funds to make the disbursement came from a line of credit drawn from the Bank of Idaho. A $70,000 loan from Ron Warnecke does not appear to have been actually made, which may explain the "Do not enter" notation on the promissory note.

(Dkt. 53-2 at 21.)

In response to Defendants' reference to Smith's report, the Warneckes argue that Smith's findings are based upon speculation and, therefore, his findings are not sufficient to refute Plaintiffs' motion for summary judgment on the loan issue. However, the Court finds that the Warnekes' argument on this issue misconstrues Smith's report. The Warneckes are correct that the above statement from Smith's report does not conclude one way or another whether the $70,000 loan was made. Indeed, the report states that it "does not appear to have been actually made." That finding was based upon the records supplied to Smith and indicates that there is a dispute as to which loans were actually made in this case.

Defendants correctly point out that Plaintiffs bear the burden of proving their claim on this issue. A fact finder looking at Smith's report or hearing Smith's testimony could reasonably conclude that the $70,000 loan was not actually made. In other words, the issue upon which Plaintiffs seek summary judgment would require the Court to discount Smith's report in its entirety. That is a factual consideration reserved for the jury and not the Court. Moreover, the Court must view the facts in the light most favorable to the Defendants on this issue, which also includes drawing reasonable inferences from the

**MEMORANDUM DECISION AND ORDER - 21**

facts presented in favor of the non-moving party.

Based on the above, the Warneckes are not entitled to summary judgment on this issue. Plaintiffs will be required to prove at trial which loans were in fact made and not repaid.

### F.   *Distribution Following Dissociation*

The Warneckes request that the Court find as a matter of law that Warnecke was entitled to a distribution of his interest in Nitrocision upon his dissociation with the company pursuant to the Idaho Limited Liability Act. Idaho Code § 53-630.[5] Under the Act, unless otherwise provided in an operating agreement, if a member of a limited liability company is removed in accordance with the operating agreement, "then the member shall receive within a reasonable time after dissociation the fair value of the member's interest in the limited liability company as of the date of dissociation . . . as if the limited liability company were wound up as of that date." Idaho Code 53-630(1).

Defendants oppose the Warneckes' motion for summary judgment on this issue, arguing that application of the Act requires several factual findings, including determinations as to whether: (1) Warnecke is entitled to apply for distribution upon disassociation; (2) the operating agreements were executed in the best interest of

---

[5] Plaintiffs acknowledge that the Idaho Limited Liability Act was replaced by the Idaho Uniform Limited Liability Company Act effective July 1, 2010. However, "[u]ntil July 1, 2010, the original act governs all limited liability companies formed prior to July 1, 2008 that do not elect to be subject to the new act." *Bushi v. Sage Health Care, PLLC*, 203 P.3d 694, 699 (Idaho 2009) (citing Idaho Code 53-601 et seq.) The parties appear in agreement that the original act governs this case.

**MEMORANDUM DECISION AND ORDER - 22**

Nitrocision; and (3) Warnecke has the right to claim a distribution from Nitrocision, or Rigby without pleading willful misconduct or gross negligence. Defendants also argue that Warnecke has not calculated the amount to be distributed and that Nitrocision has had a negative cash flow for many years.

In their Reply, the Warneckes state that, "[a]s to Defendants assertion that summary judgment is improper because Plaintiffs have not included in the Motion an amount of the distribution, such evidence will be presented at trial." (Dkt. 60 at 9.) The Warneckes further state that "[t]he purpose of this aspect of the Motion is to establish the application of § 53-630, which will assist in narrowing the issues at trial." (*Id*.)

Plaintiffs' motion on this issue will be denied because they have failed to demonstrate that they are entitled to judgment as a matter of law. Defendants indicate that there are elements of a claim for distribution that require factual determinations. Plaintiffs simply do not address that issue. It is Plaintiffs' burden to demonstrate to the Court that they are entitled to summary judgment. They have not done so on this claim.

### G. *Defendants' Counterclaim*

In their Answer, Counterclaim and Demand for Jury Trial, (Dkt. 9), Defendants raise counterclaims against the Warneckes. Specifically, Defendants set forth the following claims: Count I alleges that Warnecke mismanaged Nitrocision by, among other things, failing to properly document transactions, causing inaccurate and misleading financial statements to be prepared, and engaging in income shifting and balance sheet manipulation; Count II alleges that Warnecke mismanaged TruTech for similar reasons

set forth in the first claim; Count IV alleges breach of contract based upon the

Warneckes' failure to pay Rigby back on their defaulted loan with Baxter Bank;[6] Count V

asserts a claim for breach of fiduciary duty for actions Warnecke allegedly took as the

CEO of Nitrocision; Count VI alleges breach of fiduciary duty as to TruTech; and Count

VII alleges fraudulent misrepresentation based upon the allegation that Warnecke

represented to Rigby, Kiehn and other third parties that certain contracts had been

obtained when they had not been obtained.

The Warneckes move for summary judgment on all of Defendants' counterclaims,

arguing that Defendants have not made a showing sufficient to establish the elements

essential to each of their causes of action. In support of their motion, the Warneckes

direct the Court to the initial disclosures in this case and the depositions of Rigby, Kiehn,

and Shaun Mulberry, the designated representative for Nitrocision and TruTech. As to the

initial disclosures, the Warneckes sought discovery, though interrogatories, seeking the

factual information supporting Defendants' counterclaims. The repeated response to those

interrogatories was that "[d]iscovery is on-going, and Defendants anticipate additional

facts supporting their [counterclaim]." (Dkt. 46-1.) Concerning the above referenced

depositions, both Mulberry and Kiehn testified that they had no knowledge that they were

asserting any counterclaims against the Warneckes and Rigby could not articulate what

the counterclaims were for.

---

[6] Defendants' counterclaims do not contain a "Count III."

**MEMORANDUM DECISION AND ORDER - 24**

In opposition to Plaintiffs' motion for summary judgment, Defendants argue that Plaintiffs "ignore . . . the forensic reports of David Smith, the books and records of the companies, which they have been provided, and a myriad of documents from Cooper Norman." (Dkt. 53 at 16.) Defendants argue that the above referenced evidence "unequivocally shows that Warnecke mismanaged the defendant companies, manipulated the books and records of the companies, and misstated and misreported the status of contracts and work in progress." (*Id*. at 16-17.)

Plaintiffs are correct that Mulberry and Kiehn had no knowledge of any counterclaims during their depositions and that Rigby could not articulate what his counterclaims were. This is a troubling fact, but Plaintiffs cite no law indicating that the party bringing a claim has to know the legal basis for the claim. Moreover, a full review of the deposition testimony submitted to the Court demonstrates that Rigby did testify about alleged misrepresentations and mismanagement by Warnecke, and Mulberry similarly testified about several problems with Warnecke's bookkeeping.

The Court finds that Plaintiffs have not carried their burden demonstrating that they are entitled to judgment as a matter of law on the counterclaims raised by Defendants.[7] Plaintiffs' motion fails to set forth the elements of Defendants' counterclaims and explain why some or all of the elements of each claim is not supported

---

[7] As discussed below, Defendant Kiehn has been granted leave to file an Amended Answer. Kiehn's Amended Answer does not raise any counterclaims against Plaintiffs. This does not, however, effect the above analysis.

**MEMORANDUM DECISION AND ORDER - 25**

by the record. Instead, Plaintiffs make the blanket allegation that Defendants have not come forward with any evidence to support their claims. This type of argument is not sufficient to obtain summary judgment under Rule 56, which places the burden upon the moving party to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## 2.   Plaintiffs' Motion to Strike

Plaintiffs move to strike the Affidavit of David Smith – Defendants' forensic analyst – which was filed in opposition to Plaintiffs' motion for summary judgment. (*Pl.s' Mot. To Strike*, Dkt. 61.) Plaintiffs argue that preclusion of the affidavit is warranted because Defendants did not comply with Fed. R. Civ. P. 26(a)(2)(B) in their disclosure of Smith as an expert,[8] and because Smith's reports are not reliable under Fed. R. Evid. 702. Although Plaintiffs' motion is styled as a motion to strike, the motion also requests that the Court "exclude Smith as a witness, or . . . exclude certain parts of his reports, and to prohibit him from testifying as to certain topics at trial." (*Mem. In Supp. Of Pl.s' Mot. To Strike* at 2, Dkt. 61-1.)

Federal Rule of Evidence 702 governs the admissibility of expert opinions and states:

> If scientific, technical or other specialized knowledge will

---

[8] During the hearing on the parties' motions, Plaintiffs withdrew the portion of their motion to strike based upon Defendants' alleged failure to comply with Rule 26. Based on Plaintiffs' withdrawal, that portion of the motion will be denied as moot and will not be discussed further in this Order.

**MEMORANDUM DECISION AND ORDER - 26**

> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993), the United States Supreme Court held that districts courts have a duty to ensure

that expert testimony offered under Rule 702 is both relevant and reliable. Whether an

expert's opinions are sufficiently reliable is dependent upon the "soundness of [the

expert's] methodology." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311,

1318 (9th Cir. 1995). Likewise, Rule 702 requires that the evidence or testimony assist

the trier of fact to understand the evidence or to determine a fact in dispute. In other

words, the expert's testimony must be relevant.

Plaintiffs do not challenge Smith's qualifications or the methodology Smith

employed in conducting his forensic analysis. Plaintiffs contend, however, that Smith's

reports contain a number of opinions that constitute subjective beliefs or are based on

pure speculation and that such opinions are not admissible under Rule 702. Plaintiffs

group these allegedly inadmissible opinions into three groups: (1) opinions that Warnecke

attempted to manipulate the books; (2) opinions that investors were mislead; and (3)

opinions concerning why an item was characterized as a loan. Plaintiffs do not

specifically quote any of the statements from Smith's reports that they wish to exclude.

**MEMORANDUM DECISION AND ORDER - 27**

The first category of allegedly inadmissible testimony sought to be excluded by Plaintiffs is a non-issue. Plaintiffs indicate that Smith's reports do not indicate that Warnecke attempted to manipulate the books, but they seek to exclude such testimony in the case that it is offered at trial. Defendants do not indicate that such testimony will be elicited and this issue appears to be resolved. To the extent this issue is raised at trial, the Court will address the issue at that time.

The second category of testimony concerns Smith's opinions that investors may have been mislead. Plaintiffs argue that "Smith's opinions in this regard are entirely speculative and, again, there is no indication that Smith has the requisite expertise to make such a determination." (Dkt. 61-1 at 5.) Although the specific statement is not quoted by the Plaintiffs, in his March 17, 2010 report, Smith states that "[a]ny investors, or creditors relying on the Nitocision balance sheet from December 29, 2005 to the release date of the 2006 financial statement in October 2007 may have been presented misleading information regarding the financial condition of the company." (Dkt. 53-2 at 41.) This statement was based on the fact that "[t]he 2005 financial statements did not include the debt on the balance sheet." (*Id.*) Smith goes on to state that it is unknown whether any person or company relied upon such information. Plaintiffs also take issue with the following statements from Smith's report:

> The 2007 Private Placement Memorandum did contain information regarding the "actual" income for 2007. The worksheet above indicates the 2007 PPM income was $696,212 higher than the actual reported income. Any investors presented with the 2007 PPM were presented

> financial statement data that was overstated compared to the
> reviewed financial statements.

(Dkt. 53-2 at 45.)

> The net income per the 2007 PPM is $402,793 but the
> reviewed financial statement net income for 2007 was $-
> 293,419 for a difference in net income of $696,212. For any
> persons or companies that relied upon the 2007 PPM, the
> information was misleading compared to the reviewed
> financial statement.

(Dkt. 53-2 at 57.)

Contrary to Plaintiffs' argument, the above quoted statements from Smith's report

do not appear to be based upon speculation. Smith compared data available to the public

(including investors) with data indicating Nitrocision's actual income. He found that the

information available to the public did not accurately reflect the value of the company.

The opinion that a person or company could be mislead by the inaccurate information is

not speculative.

Finally, Plaintiffs take issue with Smith's evaluation of Warnecke's loans to

Nitrocision. Plaintiffs argue that "Smith's commentary as to what may have been

occurring or speculation as to why something was done is inappropriate and should be

stricken." (Dkt. 61-1 at 5.) Plaintiffs further state that "[t]hese opinions are inherently

unreliable because Smith does not have the expertise to render such an opinion as to what

amounts to the thoughts or motives of individuals including Mr. Warnecke. . . . Such

opinions are wholly speculative and therefore unreliable." (Dkt. 61-1 at 5-6.)

**MEMORANDUM DECISION AND ORDER - 29**

As noted in the discussion on the Warneckes' motion for summary judgment, Smith evaluated promissory notes, which purported to be loans from Warnecke to Nitrocision. Comparing Nitrocision's records to the promissory notes Smith concluded that, as a C.P.A. and forensic analyst, he was unable to conclude that the purported loans actually had been made. Such analysis is directly within Smith's area of expertise and is relevant to the issue of whether Warnecke can prove that the loans were made, which will be his burden at trial.

For the reasons set forth above, Plaintiffs' motion to strike will be denied. To the extent that Plaintiffs seek the exclusion of Smith as a witness or portions of Smith's findings and opinions within his reports being elicited at trial, the Court will reserve ruling on those issues until they are presented at trial.

## 3.     Motions In Limine

The parties have filed four separate motions in limine seeking pre-trial orders on several evidentiary issues. Each motion will be addressed below.

Although the Federal Rules do not explicitly provide for the filing of motions in limine, the court has the inherent power to hear and decide such motions as a function of its duty to expeditiously manage trials by eliminating evidence that is clearly inadmissible for any purpose. *Luce v. U.S.*, 469 U.S. 38, 41 n.4 (1984). The purpose of the Federal Rules of Evidence is to secure fairness in administration, eliminate unjustifiable expense and delay and promote growth and development of the law of evidence. Fed. R. Evid. 102. Moreover, Rule 103(c) of the Federal Rules of Evidence indicates that proceedings

**MEMORANDUM DECISION AND ORDER - 30**

shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury. Accordingly, motions in limine are the preferred vehicle to address anticipated evidentiary issues. Such motions present the trial court with the opportunity "to rule in advance of trial on the relevance of certain forecasted evidence . . . without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).

However, notwithstanding the benefit motions in limine provide in judicial efficiency, "a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1218 (D. Kan. 2007). Because pretrial evidentiary rulings are prospective in nature–where the court has not yet seen or heard the challenged evidence in full context–and because they restrict the opposing party's presentation of his or her case, courts have recognized that motions in limine should be granted sparingly and only in "those instances when the evidence plainly is 'inadmissible on all potential grounds.'" *Wilkins*, 487 F. Supp. 2d at 1218-19 (quoting *Townsend v. Benya*, 287 F. Supp. 2d 868, 872 (N.D. Ill. 2003)). Where a party fails to pinpoint the challenged evidence, or the grounds on which it should be excluded, the motion in limine will be denied.

## A. *Defendant Kiehn's Motion to Exclude Evidence Related to Her Original Answer*

The initial Answer (Dkt. 9) filed in response to Plaintiffs' Complaint was filed on behalf of all the defendants, including Rigby's daughter Diane Kiehn. In that Answer,

Kiehn admits that she served as CEO of Nitrocision. She also joined in the counterclaims raised against the Warneckes.

Following the filing of the initial Answer, Kiehn retained different counsel and moved the Court for leave to file an Amended Answer. (Dkt. 70.) The Amended Answer deletes Kiehn's allegation that she was ever CEO of Nitrocision. It also deletes her counterclaims against the Plaintiffs. The Warneckes did not oppose Kiehn's motion to amend her answer and the Court granted Kiehn leave to file an amended answer during the hearing on the parties' motions.[9]

In her motion for leave to file an amended answer, Kiehn also asked the Court for an order in limine excluding evidence related to her initial Answer, including evidence that she ever served as CEO for Nitrocision or that she filed counterclaims against the Warneckes in this case. Kiehn also seeks an order in limine excluding the statement (which she admits to making) that she would kill Warnecke if he caused her family to lose money. Plaintiffs oppose Kiehn's motion in limine and argue that they should be able to elicit testimony at trial concerning all of the matters Kiehn seeks to exclude.

### (1)   *Kiehn's statement that she acted as CEO of Nitrocision*

Kiehn argues that Plaintiffs should not be able to elicit testimony concerning the fact that she admitted in her initial answer that she acted as CEO for Nitrocision. In support of this motion, Kiehn asserts that she has already testified in her deposition, and

---

[9] Kiehn's Amended Answer was filed on November 6, 2012. (Dkt. 107.)

will be testifying at trial, that she acted as an agent of Defendant Rigby at Nitrocision and assisted him and the company with decisions regarding Warnecke's employment. Given this proposition, Kiehn argues that her liability, if any, is not dependent on her formal title with Nitrocision, and the statement that she was CEO adds nothing of probative value and may confuse the jury.

Plaintiffs argue that Kiehn's statement in her initial answer is both relevant and admissible. Specifically, Plaintiffs argue that Kiehn's statement that she was CEO is relevant to Plaintiffs' claim for tortious interference with contract. Indeed, Kiehn's association with Nitrocision and her involvement in the decisions related to Warnecke's employment and termination are certainly relevant.

Although Plaintiffs do not specifically explain why the *title* of CEO would be relevant since Kiehn has admitted that she was her father's agent and assisted Nitrocision with decisions regarding Warnecke's employment, the Court is reluctant to allow Kiehn to avoid an admission made in her initial answer. Kiehn will be able to explain her admission at trial and it will be for the jury to determine what weight should be given to her inconsistent statements. Moreover, neither party discusses why her prior admission could not be used for the purposes of impeachment under Fed. R. Evid. 607.

Defendant Kiehn's motion in limine will be denied on this issue.

**(2)    *The "kill" comment***

Kiehn attended a meeting with Nitrocision representatives on January 24, 2009. According to Kiehn, this meeting occurred shortly after she discovered that Warnecke

had provided a list of contracts to financial institutions and potential investors containing inaccurate representations regarding the status of Nitrocision contracts. After discovering that Nitrocsion was showing a net loss of approximately $8.5 million, Kiehn lost her temper during the meeting and told Warnecke that she was going to "kill" him if he caused her family to lose money. Kiehn has admitted to making this statement and explains that it was made in the heat of anger. Clearly, she did not carry through with her threat.

Kiehn argues that her statement should be excluded under Fed. R. Evid. 403 because the probative value of the statement is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and the potential that the jury will be misled.

Plaintiffs argue that the probative value of Kiehn's statement is high because it shows Kiehn's "state of mind not only at the time the statement was made, but also explains her subsequent actions and behavior toward Warnecke." (Dkt. 78 at 5.) Plaintiffs also anticipate that Defendants will offer testimony concerning Warnecke acting inappropriately toward Kiehn, and that her statement is relevant to explain Warnecke's actions that followed.

It is reasonable to assume that Kiehn's statement will invoke an emotional response from the jury. The question is whether such emotional appeal outweighs the statement's probative value. Having carefully considered the issue, because Kiehn is free to explain why the statement was made and the circumstances under which it was made, the Court concludes that Plaintiffs may elicit testimony concerning the statement. The motion in

**MEMORANDUM DECISION AND ORDER - 34**

limine seeking exclusion of the "kill" comment will therefore be denied.

**(3)    *Kiehn's counterclaims***

Kiehn asks the Court to exclude any evidence concerning the fact that she made counterclaims against Plaintiffs in her original answer. She argues that such evidence is not relevant. Plaintiffs have not explained how the fact that Kiehn initially asserted claims against them would be relevant. Unlike Kiehn's admission that she acted as the CEO of Nitrocision, which the Court has found relevant to Plaintiffs' tortious interference claim, the fact that Kiehn brought counterclaims does not appear to be related to a fact of consequence in determining the action or have "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401.

Defendant Kiehn's motion in limine will be granted on this matter.

**B.    *Plaintiffs' Motion in Limine***

Plaintiffs have filed a motion in limine (Dkt. 68) seeking the exclusion of any evidence or argument pertaining to Plaintiffs' income following Warnecke's departure from Nitrocision or Plaintiffs' assets. Plaintiffs also seek the exclusion of evidence or argument related to Defendants' Counterclaims. Both issues are discussed below.

**(1)    *Plaintiffs' income and assets***

Concerning Plaintiffs' income and assets, Plaintiffs argue that evidence related to these matters has no relevance under Fed. R. Evid. 401 and should be excluded under Fed. R. Evid. 402. Moreover, Plaintiffs argue that, "[t]o the extent Defendants contend that the evidence has any probative value, it should be excluded on the grounds that 'its

**MEMORANDUM DECISION AND ORDER - 35**

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" (Dkt. 68-1 at 2 (quoting Fed. R. Evid. 403)).

Defendants assert that this evidence is relevant to their Counterclaim for breach of contract. Specifically, Defendants argue that, "[i]f [Mr. Warnecke's] contract is found to be in force at the time of [his] departure from Nitrocision, the contract contains nondisclosure and non-compete clauses which Mr. Warnecke may have violated." (Dkt. 74 at 2.) The Court agrees that information generally concerning the Warneckes' assets is irrelevant and the motion will be partially granted on that issue. However, it appears that Warnecke's income (or at least the source of his income after he was terminated) may be relevant to Defendants' counterclaim for breach of contract.

The Court will grant Plaintiffs' motion on this issue, but Defendants will be allowed to make an offer of proof outside the presence of the jury *prior* to eliciting testimony or attempting to offer other evidence pertaining to the Warneckes' assets or Warnecke's income following his departure from Nitrocision. Additionally, this potential testimony or other evidence must not be referenced by any counsel during attorney conducted voir dire of the jury or opening statements.

**(2)** *Counterclaims*

Plaintiffs request that the Court exclude any evidence related to Defendants' counterclaims as a discovery sanction pursuant to Fed. R. Civ. P. 37. Plaintiffs argue that

**MEMORANDUM DECISION AND ORDER - 36**

a sanction is warranted because Defendants failed to provide a computation of the damages claimed on their counterclaims.

Fed. R. Civ. P. 26(a)(1)(A)(iii) requires parties to provide "a computation of each category of damages claimed by the disclosing party -- who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based." Rule 26 also requires parties to "supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1). Finally, Rule 37(c)(1) "forbid[s] the use at trial of any information required to be disclosed by Rule 26(a) that [was] not properly disclosed." *Hoffman v. Construction Protective Services, Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008).

Defendants oppose the motion on this issue for three reasons. First, Defendants assert that discovery was produced in this case largely on an informal basis. Second, Defendants argue that Plaintiffs' motion in limine is actually a discovery motion for sanctions and that, as such, it should not be considered because Plaintiffs did not comply with Local Rule 37.1, which requires the moving party to demonstrate that they made a reasonable effort to reach agreement with the opposing attorneys on the matters set forth in the motion. Third, Defendants argue that the sanction Plaintiffs are seeking -- the exclusion of Defendants' counterclaims -- falls under Rule 37(b)(2)(A)(ii), which only applies when a party disobeys a discovery order.

**MEMORANDUM DECISION AND ORDER - 37**

The argument that Plaintiffs may seek sanctions only when a party has violated a discovery order is without merit. However, Defendants make a good point that the sanctions sought are overly severe. Rule 37(c) makes clear that a party cannot introduce evidence at trial that should have been provided, but was not provided, under Rule 26(a). The Rule does not dictate that Defendants' counterclaims be stricken, or that Defendants should be prohibited from attempting to establish those claims. But it does mean that Defendants may not be able to prove an essential element of their counterclaims, i.e., damages.

At the hearing on the parties' motions, the Court ordered counsel to meet and confer on what evidence has already been disclosed by each party on their respective claims and counterclaims. The Court also indicated that, if the parties cannot come to an agreement as to what evidence has been disclosed, the Court will conduct an additional hearing regarding the issue. (Dkt. 106.) Based on these considerations, the Court will deny the motion in limine on this issue at this time. However, the parties should remain aware that they will not be allowed to present evidence -- concerning damages or otherwise -- that was not provided in accordance with Rule 26(a).

### C.     *Defendant Kiehn's Motion in Limine re: Tortious Interference*

The final motion before the Court, filed by Defendant Kiehn, seeks an order in limine excluding evidence of Plaintiffs' alleged damages for their claims of tortious interference with contract and distribution for dissociation claims on the ground that Plaintiffs failed to disclose a proper calculation of damages on those claims.

**MEMORANDUM DECISION AND ORDER - 38**

For the same reasons the Court denied Plaintiffs' motion in limine seeking the exclusion of Defendants' counterclaims, the Court will deny Kiehn's motion in limine seeking the exclusion of evidence relating to Plaintiffs' damages. This ruling, however, is subject to the same caveat that, if the parties cannot come to an agreement as to what evidence has been disclosed, the Court will conduct an additional hearing regarding the issue. Similarly, as stated above, the parties will not be allowed to present evidence -- concerning damages or otherwise -- that was not provided in accordance with Rule 26(a)

## ORDER

### NOW THEREFORE IT IS HEREBY ORDERED that:

1.      Plaintiffs' Motion for Partial Summary Judgment (Dkt. 46) is GRANTED in part and DENIED in part in accordance with the Court's discussion in the above memorandum.

2.      Plaintiffs' Motion to Strike (Dkt. 61) the affidavit of Defendants' forensic expert is DENIED.

3.      Defendants' Motion in Limine (Dkt. 66) seeking an order prohibiting Warnecke from testifying as to the value of Nitrocision and TruTech is DENIED in accordance with the Court's ruling from the bench at the hearing on the parties' motions.

4.      Plaintiffs' Motion in Limine (Dkt. 68) is GRANTED as it relates to the Warneckes' assets and DENIED as it relates to Defendants' counterclaims.

5.      Defendant Kiehn's Motion to Amend (Dkt. 70) is GRANTED in accordance with the Court's ruling from the bench at the hearing on the parties' motions

**MEMORANDUM DECISION AND ORDER - 39**

and Defendant Kiehn's alternative motion in limine (Dkt. 70) is DENIED.

6.    Defendant Kiehn's Motion in Limine (Dkt. 96) regarding Plaintiffs'

damages is DENIED.



DATED: November 29, 2012

_____

Honorable Candy W. Dale
Chief United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 40**